UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

**CRIMINAL ACTION NO. 16-36-DLB-CJS**

**UNITED STATES OF AMERICA**                                               **PLAINTIFF**

vs.                  **MEMORANDUM OPINION AND ORDER**

**MARK M. BROWN**                                                     **DEFENDANT**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

**I.   INTRODUCTION**

This matter is before the Court on Defendant's Motion to Suppress (Doc. # 25) all evidence seized from his motel room at the Super 8 Motel in Maysville, Kentucky on August 6, 2016, pursuant to a state search warrant. In his motion, he alleges the search warrant lacked probable cause, and was based, in part, upon unlawfully obtained evidence discovered when the officers illegally entered the motel room (*id.*).

On November 30, 2016, the Court held an evidentiary hearing on the motion. (Doc. # 29). Defendant Brown was present at the hearing and represented by Attorneys Raymond Bogucki and Tim Schneider. The United States was represented by Assistant United States Attorney Tony Bracke. The hearing was recorded by Official Court Reporter Lisa Wiesman. After the transcript of the hearing was filed (Doc. # 31), Defendant filed a supplemental memorandum (Doc. # 33), and the United States filed its response (Doc. # 34). The deadline for Defendant's reply brief having now expired, the motion is now ripe for review. For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 25)

1

is hereby **denied.**

## II.   FINDINGS OF FACT

Six witnesses testified during the evidentiary hearing.  The United States called Maysville, Kentucky Police Sergeant Eric Hylander and Maysville Police Officers Tim Smith, Kenneth Fuller, and Dustin Bickmeyer.  Defendant called Senket Patel, the Super 8 Manager, and retired officer Michael Rigdon as witnesses.  Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings:

1. At approximately 5:25 a.m. on August 6, 2016, Maysville, Kentucky police officers were dispatched to the Super 8 Motel in Maysville for a possible domestic situation involving a handgun.  Dispatch further advised that the male subject, later identified as the Defendant, was talking out of his head and possibly had a handgun.

2. Upon arriving at the motel, Sergeant Hylander spoke with Chastity Smith, an occupant of room 223, and the individual who had reported to the clerk about the domestic situation.  When the officers arrived, Ms. Smith was hiding in the back office of the motel. Although Ms. Smith was likely under the influence of something at the time, she was able to understand and answer the officers' questions coherently.  In fact, several officers were able to speak with and obtain information from her.

3. During their conversation with Ms. Smith, the officers were told that the Defendant had methamphetamine and weapons in room 223.  She also told the officers that she had become concerned for her safety because she had learned that the Defendant had killed someone and had a gun.  Ms. Smith and the dispatch report indicated that

2

another couple had been in room 223 and that another female may have been hiding in the bathroom of room 223.

4.   Ms. Smith also provided Sergeant Hylander with a baggie of suspected methamphetamine that she indicated the Defendant had given to her earlier. Ms. Smith further stated that she had been staying in room 223 with the Defendant and that her identification and other belongings were in that room.

5.   Although room 223 was registered to the Defendant only, the registration confirmed that the room had two occupants and contained a king-sized bed.

6.   While Sergeant Hylander was speaking with Ms. Smith, the Defendant appeared and was approached by officers Smith and Fuller. The Defendant was under the influence of something as well. During the officers' brief encounter with him, the Defendant consented to a search of his person by Officer Smith. During the pat-down of the Defendant, Officer Smith discovered a large amount of cash and savings bonds, amounting to almost ten thousand dollars.

7.   After discovering the large amount of currency on his person, the Defendant invoked his right to counsel, telling the officers that he didn't have anything to say and that his lawyer would speak for him. At that point the officers immediately stopped questioning him. At no time during their brief encounter with the Defendant did the officers speak to him about searching his hotel room. Nor did he refuse consent, make any comments to them, or voice any objections to them searching his room.

8.   At Officer Smith's request, Ms. Smith gave her consent for him to enter room 223 so they could retrieve her identification and look for the other female believed to be inside. No one, including the Defendant, challenged or objected to her consent. Nor did

the officers move Ms. Smith away from the Defendant's presence so she could consent.

9.      Officer Fuller, the Maysville Police Department's canine handler, had his trained narcotics dog check the hallway outside of room 223 and the exterior of the Defendant's vehicle in the parking lot.  The canine gave a positive indication for the odor of controlled substances on both the doorway to room 223 and the vehicle.  He did not react positively on any other door on the second floor of the motel.

10.     Officers Smith and Bickmeyer accompanied Ms. Smith to room 223 and found that the door to the room was slightly ajar.[1]  Neither Ms. Smith, nor the officers had a card key for the room, so they were only able to enter because the door was slightly open. Officer Smith entered the room pursuant to Ms. Smith's consent to look for her wallet and the two individuals the officers believed may still be in the room.  During the brief cursory search of the room, Officer Smith was able to quickly confirm that no one was inside.

11.     On the night stand next to the bed, Officer Smith found Ms. Smith's wallet, a loaded pistol, and a rolled up towel with a glass pipe sticking out from it.  A second loaded pistol was found between the bed and the night stand on the floor.  Women's clothing belonging to Ms. Smith was also observed in the room in plain view.  For safety purposes Officer Smith cleared the weapons, which consisted of emptying the magazine and pulling the round out the chamber.  The women's clothing found in the room was consistent with

---

[1] During the suppression hearing, the parties spent a great deal of time questioning the witnesses about whether the door to room 223 was ajar or closed upon the officers initially encountering it.  According to the Defendant, because the door was one that was designed to close automatically, it must have been closed, and the officers' testimony that it was ajar to any extent is simply not believable.  However, as there was no evidence that anyone other than the front desk clerk had a card key to the room, there would have been no means of accessing the room without breaking it down unless the door was ajar to some extent.  For these reasons, the Court concludes that the door was slightly ajar.  Nonetheless, this vehemently disputed fact is inconsequential as Ms. Smith gave proper consent as a co-occupant of the room.

Ms. Smith's prior statement that she had been staying in the room with the Defendant.

12.     After being advised of what Officer Smith observed in plain view in room 223, Sergeant Hylander contacted the Mason County Attorney who prepared an affidavit and proposed search warrant for room 223. Sergeant Hylander was the affiant. A local trial commissioner reviewed the warrant application and signed it. A copy of the affidavit in support of the search warrant and the warrant itself were admitted during the hearing as Government Exhibits 1 and 2.

13.     The affidavit sought a search warrant for room No. 223 at the Super 8 Motel, 550 Tucker Drive, Maysville, Kentucky 41056. The affiant indicated that the room was registered to Mark Brown and was located on second floor. The affidavit further provided as follows:

> Affiant has been an officer in the aforementioned agency for a period of 8 years and the information and observations contained herein were received and made in his capacity as an officer thereof.
>
> At approximately 5:25 am Maysville Police were called by Super 8 motel personnel advising of a possible domestic situation. The clerk advised that a female came to the desk and stated that the male subject had a gun in his pocket and had guns in the room. The female also said another female was hiding in the restroom of the room. When the Affiant and other MPD officers responded they encountered the female and identified her as Chasity Smith. Smith stated that the male subject Mark Brown, threw her a bag of "dope" which Affiant believes to be methamphetamine. The substance has not yet been tested. She also told Affiant that Brown had guns and she expressed fear for her own safety. Mark Brown then came into the lobby and advised Affiant that he would not speak with officers. A criminal history check reflects that the Brown is a convicted felon. The door to the room was slightly ajar, and MPD officers made entry into the room to determine if there indeed was another female in the room needing assistance. No female or other person was present in the room. When Mark Brown was patted down no weapons were located, but Brown had approximately $10,000 in cash on his person, which is being held by MPD. Chasity Smith advises that Brown is or was cooking methamphetamine in a cooler in the room. She also says there are pills in the room. MPD officers saw a cooler in the room, and saw two

    handguns and a crack pipe in the room in plain view. Both Mark Brown and Chasity Smith were both staying in the room, and Chasity Smith will consent to search. Due to the objection of Mark Smith [sic], this search warrant is being obtained. The vehicle identified above is located in the parking area of the motel and is in the possession of Mark Brown. MPD canine indicated that such vehicle contains the odor of drugs. Room has been secured and questioning of Chasity Smith continues. Mark Brown is being detained pending charging.

See Government Exhibit 1.

    14.    After the search warrant was signed, Sergeant Hylander returned to the Super 8 Motel with the warrant in hand where he and several officers began executing the warrant. During the search they found several incriminating items, including a cooler containing suspected methamphetamine, three handguns and assorted ammunition, assorted pills and marijuana, digital scales and various drug paraphernalia. The specific inventory of items seized pursuant to the warrant is found at Doc. # 26-1 at pages 6-7.

### III.    ANALYSIS

#### A.    Because Chasity Smith had actual or apparent common authority over Room 223, her consent was valid.

    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. Const. amend. IV. This constitutional protection also applies to hotel Rooms. *United States v. Allen*, 106 F.3d 695, 698 (6th Cir. 1997). This is because "an occupant of a hotel Room has a reasonable expectation of privacy there, even though he is just a guest, not an owner, of the Room." *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Under the Fourth Amendment, searches "conducted without a warrant issued upon probable cause [are] per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Consent by someone who possesses actual or apparent common authority over the hotel Room is one such exception. Although the United States' primary argument is that officers were justified in conducting a protective sweep to support the officers' initial entry into Room 223, the Court concludes that the alternative theory of consent is viable, and upholds their initial entry into the room on that basis.

It is well-settled that so long as the consenting individual has actual common authority over the Room, *United States v. Matlock*, 415 U.S. 164, 170-71 (1974), or apparent common authority over the Room, *Illinois v. Rodriguez*, 497 U.S. 177, 181, 186 (1990), officers may rely on the consent of one of the occupants of the Room. "Common authority" refers to the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Caldwell*, 518 F.3d at 429 (*citing Matlock*, 415 U.S. at 171 n. 7); *see also Georgia v. Randolph*, 547 U.S. 103, 110 (2006).

However, where consent to search was given by a person with shared authority, a warrantless search is unreasonable as to a defendant who was both physically present <u>and</u> expressly refused to consent before the search took place. *Randolph*, 547 U.S. at 120. Nevertheless, if a defendant with self-interest in objecting is nearby, but is not invited to take part in discussion regarding consent to search, that potential objector "loses out," and the search will be deemed valid. *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (*citing Randolph*, 547 U.S. at 121). That is precisely what occurred here.

Although room 223 was registered in the Defendant's name, that same registration indicated two guests, supporting Ms. Smith's status as co-occupant. She also had joint access to and control of the room, telling the officers that she had been staying with him in the room. Her status as co-occupant was ultimately corroborated when the officers found her wallet on the night stand along with her clothes inside the room. The fact that she did not have a card key to the room is not significant because the same can be said for the Defendant.

The Sixth Circuit's decision in *Caldwell*, cited above, does not dictate a different result. In fact, other than the fact that the female co-occupant in *Caldwell* had signed into the room as a registered guest, the facts in *Caldwell* are almost on all fours with those here. That sole distinction does not warrant a finding that she lacked actual or apparent authority over the room. *See United States v. Murray*, 821 F.3d. 386, 392 (3rd Cir. 2016) (fact that the officers knew the room was registered to someone else does not render consent invalid, so long as individual giving consent has actual or apparent authority over the room).

Moreover, there is no proof that the officers here removed Ms. Smith from the Defendant's presence in an attempt to gain her consent. In fact, the exact opposite is true. After the Defendant told the officers that he didn't have anything to say and that his lawyer would speak for him, the officers stopped speaking with him. The officers then turned to Ms. Smith and requested and received Ms. Smith's consent to search room 223. If Defendant wished to formally object to her consent, he could have certainly done so at that point but did not. As a result, *Georgia v. Randolph* does not require the Court to invalidate Ms. Smith's consent. Defendant's actions here were hardly comparable to those of the physically present co-occupant in Randolph who "unequivocally refused" permission to

8

search a residence. *Randolph*, 547 U.S. at 107.

Here, based on the facts presented to them, the officers reasonably believed that Ms. Smith possessed common authority over room 223. Therefore, her consent to allow them into the room was valid.

One final point deserves brief comment. In the search warrant affidavit, Sergeant Hylander indicates that despite Ms. Smith's consent, "due to the objection of Mark Brown, this search warrant is being obtained." *See* Finding of Fact at ¶ 12. Based on the testimony of the officers at the suppression hearing, the Court does not believe this statement makes this situation analogous to that in *Randolph*. Rather, when he told the officers he was no longer going to make any further statements, he was exercising his right not to cooperate or speak with the officers. Rather than a formal "objection" to Ms. Smith's consent, his objection was an invocation of his right to counsel and a general disagreement with the officers' investigation. That is not the equivalent of someone who refused consent or objected to Ms. Smith's consent. Finally, as is often the case in co-occupant situations, even though officers may obtain valid consent, they still seek to obtain a search warrant in the unlikely event the consent is somehow found to be lacking. That is likely what occurred here.

**B. The incriminating items observed by Officer Smith in plain view during his brief initial entry into Room 223 were properly included in the affidavit.**

It is well-settled that officers can permissibly include in a search-warrant affidavit any observation they make in "plain view." *See United States v. Hinojosa*, 606 F.3d 875, 884-85 (6th Cir. 2010) ("Because everything that the officers observed was in plain view ... those observations were properly included in the affidavit."). An observation is made in

plain view when it occurs from a "lawful position" and does not involve a "constitutionally improper search." *Id.* at 885.

As discussed above in section III(A), Ms. Smith's valid consent permitted Officer Smith to enter room 223 to look for the two individuals thought to be inside and locate her wallet. While lawfully inside the room, Officer Smith observed several incriminating items, including two loaded pistols and drug paraphernalia. Because Officer Smith was in a lawful place while inside room 223 pursuant to Ms. Smith's valid consent, his observations were properly included in the search warrant affidavit.

> **C.    The search warrant affidavit contained sufficient probable cause to justify its issuance, with or without the information gleaned from Officer Smith's initial observations of Room 223.**

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To comply with the Fourth Amendment's protections, an affidavit submitted in support of a search warrant must include sufficient information to allow the court to find probable cause to justify the search and seizure. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). "In determining whether there is probable cause to issue a search warrant, the task of the issuing magistrate is 'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005). The issuing magistrate must make the

probable cause determination based only on the information contained within the four corners of the affidavit. *United States v. Frazier*, 423 F.3d 526, 535 (6th Cir. 2005). The affidavit at issue here easily satisfies that standard.

The affidavit reflects that a named source, Ms. Smith, told officers that a male subject had guns inside the room 223. Ms. Smith produced a bag of suspected methamphetamine that she said had been given to her by that same male subject. As short time later the male subject was encountered by officers in the motel lobby. The Defendant was identified and determined to be a convicted felon. A pat down of the Defendant yielded approximately $10,000 in cash on his person. Ms. Smith also indicated that the Defendant was cooking methamphetamine in a cooler in the Room, and that there were pills in the Room. During his brief initial entry into the room, officer Smith observed two handguns and a crack pipe. Finally, the affidavit reflects that a narcotics canine had reacted positively for the presence of a narcotic odor on Defendant's vehicle in the motel parking lot. These facts, when considered in their totality, are more than sufficient to satisfy the probable cause standard.

Additionally, even if the Court were to ignore the few additional facts gleaned from the brief initial entry into the room, there is still more than ample evidence establishing that the room would contain evidence of drug activity. The remaining information included a named witness who reported seeing guns and drugs in the room as well as locating a very large amount of currency on the Defendant's person. The named witness's statement about drugs in the room was corroborated by a bag of suspected methamphetamine that she provided to the officers indicating that the Defendant had given to her. Additionally, the narcotics canine positively reacted for the presence of drugs on Defendant's vehicle. All

11

of these facts support a finding of probable cause, even without reference to the additional observations of Officer Smith during his brief entry into the room to locate Ms. Smith's wallet.[2]

## IV.  CONCLUSION

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)   Defendant's Motion to Suppress (Doc. # 25) is **DENIED**;

(2)   The time period between November 11, 2016 and the date of the entry of this Order, totaling eighty-four (84) days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D) & (H); and

(3)   This matter is scheduled for a **Status Conference** on **Thursday, February 9, 2017 at 2:00 p.m. in Covington** at which time the Court will set this matter for trial.

This 3rd day of February, 2017.



Signed By:
David L. Bunning   DB
United States District Judge

K:\DATA\ORDERS\Covington Criminal\2016\16-36 MOO denying MTS.wpd

---

[2] The United States also seeks to justify the officers' initial entry into Room 223 based upon exigent circumstances and/or a protective sweep. Because the Court has upheld the initial entry on the basis of a validly obtained consent by Ms. Smith (*See* Section III(A)), and because probable cause would exist even without the observations gleaned from the initial entry, the Court need not address these alternative arguments. For these same reasons, the Court need not address the United States' alternative *Leon* good faith argument.